## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| SHEENA ROBINSON, individually and as the Administratrix of the Estate of Rodney Keith Robinson, II, | ) ) ) ) | |
| Plaintiff, | ) ) | C.A. No. |
| | ) | JURY TRIAL DEMANDED |
| v. | ) ) | |
| PATROLMAN DYLAN EBKE, individually, and TOWN OF DEWEY BEACH, | ) ) ) | |
| Defendants. | ) ) | |

## COMPLAINT

1.      On March 19, 2022, a white police officer shot and killed another young black man in America.  Defendant Patrolman Dylan Ebke ("Defendant Ebke"), a member of the Dewey Beach Police Department ("DBPD"), and another officer cornered the young black man, Rodney Keith Robinson, II ("Keith").  Despite having the ability to withdraw from Keith's presence, barricade themselves, surround the cornered Keith, and bring about a peaceful resolution, one officer tased Keith and Defendant Ebke fatally shot Keith.

2.      For over a decade, the Defendant Town of Dewey Beach ("Town") has thumbed its nose at the Constitution's prohibition against excessive force.  The Town has allowed its officers to engage in excessive force against visitors to the popular tourist town with impunity.  The Town even allowed one of its officers – perhaps the officer decorated with the most claims of excessive force – to teach officers, including Defendant Ebke, how to use force against the citizenry and visitors of Dewey Beach.

3.      Perhaps recognizing the DBPD had a problem, a study of DBPD was commissioned in 2019.  The study found numerous problems with the DBPD including failed leadership in the

1

Chief of Police and outdated technology, including body-worn cameras. Like an ostrich, however, the Town ostensibly disregarded the findings of the study. The Chief of Police in 2019 remained the Chief of Police until after Keith was shot and killed by Defendant Ebke. The DBPD had fewer body-worn cameras in 2022 than it did in 2019 despite the passage of state law requiring their use.

4.    Quite simply, the death of someone at the hands of a DBPD officer was inevitable. The policies, customs, or practices that would lead to Keith's death on March 19, 2022, had been in place for over a decade. Keith was unfortunate to be in the wrong place and the wrong time.

5.    This is a wrongful death and survivorship action brought by Keith's grieving mother on behalf of herself and her family.

**The Parties**

6.    Plaintiff Sheena Robinson (Mrs. Robinson) is a Delaware resident. She is the mother of Keith, a 21-year old black male, who was shot and killed by Defendant Ebke on March 19, 2022, in Dewey Beach, Delaware. Mrs. Robinson was named as Administratrix of Keith's Estate by the Sussex County Register of Wills on or about February 1, 2023.

7.    Defendant Ebke, was, at all times relevant, a police officer acting under color of state law as an agent or employee of the Dewey Beach, Delaware Police Department ("DBPD") located at 105 Rodney Avenue, Dewey Beach, Delaware.

8.    Defendant Town of Dewey Beach ("Town") is a municipal corporation duly organized, existing, and operating under and pursuant to the applicable laws of the State of Delaware. At all relevant times, Town was the employer of Ebke and had responsibility for hiring, training, supervision, disciplining, and retention of police officers employed by Town, including Ebke.

**Jurisdiction & Venue**

9.      This is a civil action for damages arising under the Fourth and Fourteenth Amendments to the United States Constitution and 42 U.S.C. §§ 1983 and 1988.

10.      This Court has subject matter jurisdiction over the claims asserted herein pursuant to 28 U.S.C. §§ 1331 and 1343 and supplemental jurisdiction pursuant to 28 U.S.C. §1367.

11.      Personal jurisdiction is proper since all parties either reside in the District, conduct business in the District, or the unlawful actions giving rise to the claim took place within this District.

12.      Venue is properly in this Court pursuant 28 U.S.C. §1391(b) because the events giving rise to the suit occurred in this judicial District.

13.      Pursuant to Dewey Beach Town Code § 170-1, counsel for Mrs. Robinson sent a letter via certified mail, return receipt requested, to each of Mayor William Stevens and Town Manager Bill Zolper putting the Town on notice of Mrs. Robinson's claims. The letters were mailed on May 6, 2022, and the return cards indicate they were delivered to each of the two recipients on May 9, 2022.

**The Starboard Restaurant and Bar**

14.      The Starboard Restaurant and Bar (the "Starboard") is situated at or near the corner of DE Route 1/Coastal Highway ("Coastal Highway") and Saulsbury Street in Dewey Beach, Delaware. The Starboard is a popular location for residents and visitors to eat and consume alcohol in the Town. Its opening for the 2022 season was the night of March 18, 2022.

15.      Directly north across Saulsbury Street from the Starboard is Izzy Plaza, which also fronts on Coastal Highway. An alley runs behinds Izzy Plaza, but a fence across the alley prevents someone from travelling north from Saulsbury Street to the next street, Swedes Street. A

breezeway through the first level of Izzy Plaza connects the alley to the sidewalk along Coastal Highway.

16.    In that area, Costal Highway is a divided highway with two northbound lanes and two southbound lanes.  Coastal Highway is the main road going north-south through Dewey Beach.  Except at intersections like that with Saulsbury Street, a concrete median separates the northbound and southbound lanes of Coastal Highway.

17.    Although traffic on Saulsbury Street can proceed east or west, there are no lane markings on Saulsbury Street.

### The Night of March 18-19, 2022

18.    On March 18, 2022, Keith and a friend traveled from Milford, Delaware, to Dewey Beach to go to the Starboard for its opening night.

19.    While leaving the Starboard in the early morning hours of March 19, 2022, someone employed by the Starboard told some members of the DBPD that Keith had a gun.

20.    The officers approached Keith.  No doubt well aware that confrontations between young black men and police do not typically end well for young black men, Keith was presumably scared and therefore fled.

21.    Approximately an hour or so later, Keith returned to the area of the Starboard. Keith was apparently trying to meet up with someone to return to Milford.  Another Starboard employee contacted DBPD to inform them Keith was back at the Starboard.

22.    Two DBPD officers, Defendant Ebke and Officer John Rhodes, pursued Keith. Keith ran into the alley behind Izzy Plaza, but he encountered the fence blocking the alley's exit.

23.    The two DBPD officers followed Keith into the alley.  Keith was against the fence.

24.     The two officers had two available exits from the alley – the entrance to Saulsbury

Street and the breezeway at Izzy Plaza.  Nonetheless, with Keith cornered in the alley against the

fence, Officer John Rhodes deployed a taser at Keith.  Defendant Ebke fired his department-issued

firearm at Keith, fatally striking him.  The two officers then exited the alley through the breezeway.

25.     Keith, suffering a gunshot wound, travelled out of the alley back across Saulsbury

Street and was found dead behind the Starboard.

### The History of Excessive Force Cases Against the Town and the DBPD

26.     The Town has been accused of violating the Fourth and/or Fourteenth Amendment

rights of its citizens on a number of occasions.  Some of the following are examples:

a.  Plaintiff Matthew Ferguson filed a lawsuit in the Superior Court of the State of

Delaware against the Town and three of its officers in August 2004 alleging claims for

excessive force and *Monell* liability against the Town, gross and wanton negligence,

false arrest, malicious prosecution, and intentional infliction of emotional distress.  The

plaintiff alleged that Town police officers used excessive force against him while he

was intoxicated in Dewey Beach.  The case was resolved through binding arbitration

in November 2006.[1]

b.  Plaintiff Gary Goodwin filed a lawsuit in the U.S. District Court for the District of

Delaware on June 19, 2012, alleging, *inter alia*, he was beaten by police officers for

the Town for no apparent reason while walking to catch the "Jolley Trolley."  A

Stipulation of Dismissal was filed on January 15, 2014.[2]

---

[1] The allegations in this Paragraph are based upon the docket in the matter of *Ferguson v. Town of Dewey Beach, et al.*, in the Superior Court of the State of Delaware, C.A. No. SS04C-08-004, as well as a reported decision found at 2006 Del. Super. LEXIS 182, 2006 WL 1174017.

[2] The allegations in this Paragraph are based upon the Complaint and docket in the matter of *Goodwin v. Town of Dewey Beach, et al.*, C.A. 1:12-cv-00773-LPS, in the U.S. District Court for the District of Delaware.

c.   In June 2011, an Officer Gregory Lynch ("Officer Lynch"), formerly of the DBPD,

threw a gentleman who was in his sixties off of a bicycle and onto the ground for no

apparent reason.  Lynch and another officer then put their knees in Mr. Shock's back,

and Lynch put his foot on the side of Mr. Shock's head and face and ground Mr.

Shock's head and face into the pavement and gravel.  Mr. Shock filed suit, and a

Stipulation of Dismissal was filed in August 2014.  Upon information and belief, the

case settled for $175,000.00.[3]

d.   Plaintiff Allen Wedell filed a lawsuit in the U.S. District Court for the District of

Delaware on May 31, 2013, alleging, *inter alia*, excessive force and unlawful detention

in connection with a traffic stop by police officers for the Town.[4]  A Stipulation of

Dismissal was filed on June 5, 2014.

e.   In or about July 2014, Kelli Harman was vacationing in Dewey Beach.  She and her

family had received a noise complaint one evening.  Officer Lynch and other DBPD

officers had written her a ticket that evening.  Officer Lynch returned to Ms. Harman's

vacation residence the following day demanding she and her adult son provide him

with identification, which they had provided the night before.  When Ms. Harman

began asking questions about him being there again, Officer Lynch told her to put her

hands behind her back and moved aggressively to Harman.  Officer Lynch grabbed Ms.

Harman, threw her into a door or threshold and then to the ground.  While Ms. Harman

was handcuffed at the DBPD station, she heard Officer Lynch tell another officer, "you

---

[3] The facts in this Paragraph are based upon the Complaint and docket in the matter of *Shock v. Lynch*, C.A. 1:13-cv-00974-GMS, in the U.S. District Court for the District of Delaware.  The settlement amount was reported in a story in the Cape Gazette on or about November 19, 2019.

[4] The allegations in this Paragraph are based upon the Complaint and docket in the matter of *Wedell v. Town of Dewey Beach, et al.*, C.A. 1:13-cv-00973-SLR, in the U.S. District Court for the District of Delaware.

should have seen the look on that bitch's face when I threw her down." Ms. Harman

filed suit in the U.S. District Court for the District of Delaware, and a Stipulation of

Dismissal was filed on December 2, 2015.[5]

f.  Jeffrey Smith filed a lawsuit in the U.S. District Court for the District of Delaware on

February 21, 2019, alleging, *inter alia*, excessive force by the Chairman of the Dewey

Beach Audit Committee.[6]  A judgment against the four defendants was entered,

pursuant to an offer of judgment, on October 8, 2019.

g.  Mark Taylor filed a lawsuit in the U.S. District Court for the District of Delaware

alleging Officer Lynch beat him in the face while he was laying on a stretcher receiving

medical treatment.  Officer Lynch subsequently swore out a false affidavit against Mark

Taylor saying Mark Taylor tried to strangle him.  Ultimately, Officer Lynch pled guilty

to perjury in connection with the false affidavit and assault on Mark Taylor.  A

Stipulation of Dismissal was entered on December 27, 2022.[7]

### The Dangerous Officer Lynch Trains Defendant Ebke

27.    Upon information and belief, for a period of time leading up to at least 2019, Officer

Lynch was in charge of training seasonal DBPD officers in the use-of-force.

28.    At the time of the Mark Taylor incident in the summer of 2019, Defendant Ebke

was a seasonal officer with DBPD.[8]

---

[5] The facts in this Paragraph are based upon the Complaint and docket in the matter of *Harman v. Lynch*, C.A. 1:15-cv-00229-SLR, in the U.S. District Court for the District of Delaware.

[6] The allegations in this Paragraph are based upon the Complaint and docket in the matter of *Smith v. Town of Dewey Beach, et al.*, C.A. 1:19-cv-00360-RGA-SRF, in the U.S. District Court for the District of Delaware.

[7] The facts in this Paragraph are based upon the pleadings and docket in the matter of *Taylor v. Lynch, et al.*, C.A. 1:21-cv-01036 LFR, in the U.S. District Court for the District of Delaware.

[8] The facts in this Paragraph are based upon the pleadings and docket in the matter of *Taylor v. Lynch, et al.*, C.A. 1:21-cv-01036 LFR, in the U.S. District Court for the District of Delaware.

29.     While Officer Lynch was not the official use-of-force trainer in the summer of 2019, he was allowed by the Town and its Chief, Samuel Mackert, to interact with the seasonal officers:

a.  Lynch gave seasonal DBPD officers a tour when they started, which consisted of telling new officers where the security cameras were located so that they could use excessive force against arrestees without being seen;

b.  Lynch said that an officer could not get into trouble for excessive force as long as the officer hit a suspect as soon as the suspect moved toward the officer; and

c.  Lynch bragged about hitting people with rocks.

30.     On one seasonal officer's first night on the job, she witnessed Office Lynch tase someone at the Starboard and then say, "I hope I renewed my license."

31.     Moreover, Defendant Ebke was present when Officer Lynch attacked Mark Taylor in August 2019.  Defendant Ebke stopped another seasonal DBPD officer from intervening in Officer Lynch's attack on Mark Taylor while he laid on the stretcher.[9]

## The DBPD Encourages Officers to be Aggressive

32.     The Town and DBPD encouraged seasonal officers to write citations.  Instead of asking visitors/residents to empty an open container of alcohol, seasonal officers were expected to write a citation.

33.     The Town and DBPD encouraged seasonal officers to aggressively pursue visitors/residents who urinated in public.  If the visitor/resident ran when confronted by the police, seasonal officers were encouraged by the Town and DBPD to charge the person with resisting arrest.

---

[9] The facts in this Paragraph are based upon the pleadings and docket in the matter of *Taylor v. Lynch, et al.*, C.A. 1:21-cv-01036 LFR, in the U.S. District Court for the District of Delaware.

**DBPD Chose Not to Use Body-Worn Cameras**

34.    Upon information and belief, in 2019, the Town and DBPD had one body-worn camera for officers to wear.

35.    In the Summer of 2021, the Delaware General Assembly passed and the Delaware Governor signed a bill that would require most, if not all, police agencies in Delaware to wear body-worn cameras.  Proposed regulations were due by January 2022.

36.    Upon information and belief, in March 2022, DBPD did not have any body-worn cameras despite the fact that legislation had passed the Delaware General Assembly and was being implemented mandating police officers wear body-worn cameras.

37.    Upon information and belief, Officer Rhodes had been loaned a "Go Pro" camera to wear on the night of March 18-19, 2022, but he did not activate it prior to the killing of Keith.

**The Study of the DBPD in Early 2019**

38.    In January of 2019, the Town of Dewey Beach commissioned a study of its police department by Captain Gregory A. Warren, Ed.D., who was retired from the Delaware State Police. The report was based upon certain data that pre-dated the publication of the report.  Dr. Warren's report was dated June 30, 2019, and was posted on the Town's website on or about July 26, 2019. The report made, *inter alia*, the following findings:

    a.  The DBPD was understaffed;

    b.  The DBPD's model of relying on seasonal officers during the summer was problematic;

    c.  The DBPD suffered from low morale;

    d.  The DBPD needed to "revisit its own table of organization, shift scheduling system, and job responsibilities of each and every person serving within the" DBPD;

9

e.   There was a lack of trust by "almost everyone interviewed for this study" based upon "a deep divide or bifurcation that specific personality conflicts and perceived political interference have caused within the Town of Dewey Beach both in the past and even today";

f.   There was an inadequate training budget;

g.   The DBPD facilities' were inadequate;

h.   There was inadequate training for officers acting as supervisors;

i.   There were too many officers designated by rank and pay as supervisors;

j.   The Department's Annual Performance Appraisal contained an evaluation of whether the officer "'Does not shy away from physical confrontation'", which could be construed as condoning officers "'never backing down'", etc.;

k.   There was "some degree of concern about the current effectiveness of the chief of police and the overall effectiveness of the leadership and supervisory management practices within the police department at this time";

l.   Internal and external communication was "lacking", including what was in the DBPD's policy manual and between and among the chief of police and the DBPD's officers and employees;

m.   The DBPD's technology, including body cams, needed to be upgraded;

n.   There was, apparently, "a desire to not engage in stricter discipline or corrective action within the Department."  The report went on to state "[t]his can become a concern for obvious reasons because, circumventing the policies and or procedures in place may become the norm and part of the corporate culture of the organization if left unchecked."; and

    o.  The DBPD policy manual was "in desperate need of a complete overhaul" and had apparently not been revisited or updated in 10 years.

39.    As noted above, Dr. Warren's 2019 report faulted the effectiveness of the Chief of Police at DBPD and his leadership.  In 2019, the Chief of Police at DBPD was Samuel Mackert ("Chief Mackert").  Chief Mackert served as Chief of Police for DBPD from approximately 2009 until June 30, 2022.  Therefore, when Keith was killed by Defendant Ebke, Mackert was still the Chief.

40.    Based upon the foregoing, it is abundantly clear that the Town:

    a.  was aware that its officers were trained to be overly-aggressive regardless of the circumstances;

    b.  condoned and/or protected officers' illegal and unconstitutional behavior because they allowed Officer Lynch to officially and/or unofficially train seasonal officers, such as the young Defendant Ebke, in the use-of-force; and

    c.  Encouraged officers to escalate rather than de-escalate encounters with the public.

## Damages

41.    As a result of the intentional and/or reckless actions of Defendant Ebke and the policies, practices, and/or customs of the Town, Keith was deprived of his rights secured by the Constitutions and the laws of the United States of America and the State of Delaware, shot, and killed.

42.    Between the time of his shooting and death, Keith traveled from the alley behind Izzy Plaza and across Saulsbury Street where he collapsed and died behind the Starboard.  Mrs. Robinson, on behalf of Keith's Estate, seeks compensation for Keith's injuries, including his pain and suffering, during this time.

43.     As a result of Keith's death, his mother and Estate, on his beneficiaries' behalf, seek damages pursuant to 10 Del. C. § 3721, *et seq.*, for the following damages:

   a.  Deprivation of the expectation of pecuniary benefits his beneficiaries would have received from the Keith's continued life;

   b.  Lost contributions for support;

   c.  Reasonable funeral expenses; and

   d.  Mental anguish.

## COUNT I – EXCESSIVE FORCE (CONSTITUTIONAL)

### (Against Defendant Ebke)

44.     Plaintiff incorporates the preceding allegations as though they are expressly stated in this Count.

45.     At all times relevant, Defendant Ebke was acting under color of state law.

46.     Defendant Ebke knowingly, intentionally, and/or recklessly used excessive force against Keith on the night of March 18-19, 2022.

47.     Keith had a right to be free of excessive force.  Defendant Ebke knowingly, intentionally, and/or recklessly violated Keith's rights under the Fourth Amendment to the United States Constitution and Article I, § 6 of the Delaware Constitution as secured by 42 U.S.C. §1983.

48.     As a result of these Constitutional violations, Mrs. Robinson and her decedent suffered the injuries identified in Paragraphs 38-40.

## COUNT II – *MONELL* LIABILITY (CONSTITUTIONAL)

### (Against Defendant Town of Dewey Beach)

49.     Plaintiff incorporates the preceding allegations as though they are expressly stated in this Count.

50.    Defendant Town has a policy or custom of condoning the use of excessive force, abuse of process, and unlawful arrest/detention in violation of the Fourth Amendment to the United States Constitution and Article I, § 6 of the Delaware Constitution.  The cases cited herein involve claims against members of the Town's police department (and once an Audit Committee Chairman) for engaging in excessive force against its citizens.

51.    A number of the factors in the 2019 report by Dr. Warren, including, without limitation, understaffing, inadequate training, lack of leadership, problems with supervision, lack of discipline/accountability, evaluating officers based on them not backing down from physical confrontations, and lack of communication about the policy manual, demonstrate the policy or custom of the Defendant Town condoning the use of excessive force, abuse of process, and unlawful arrest/detention in violation of the Fourth Amendment to the United States Constitution and Article I, § 6 of the Delaware Constitution.

52.    Defendant Town has particularly condoned the use of excessive force, abuse of process, and unlawful arrest/detention by allowing Officer Lynch to train newer officers in the use of force.  Defendant Town therefore has a policy or custom of ignoring and/or condoning these Constitutional deprivations by DBPD police officers.

53.    Similarly, because of the length of time of these types of Constitutional deprivations have been occurring at the hands of its officers, Defendant Town has a policy or custom of failing to train/adequately train and/or supervise its police officers.  Such failure to train and/or supervise demonstrates the Town's deliberate indifference to the potential deprivations of Constitutional rights of the citizens of the Town and visitors to the Town, such as Keith.

54.    Keith had a right to be free of excessive force, abuse of process, and unlawful arrest/detention.  The policies and/or customs of the Town directly led to the violations of the

Fourth Amendment to the United States Constitution and Article I, § 6 of the Delaware Constitution as secured by 42 U.S.C. § 1983.

55.     As a result of these Constitutional violations, Mrs. Robinson and her decedent suffered the injuries identified in Paragraphs 38-40.

## COUNT III – WANTON NEGLIGENCE

### (Against Defendant Ebke)

56.     Plaintiff incorporates the preceding allegations as though they are expressly stated in this Count.

57.     The standard of care requires an officer to only use force against a member of the public or a suspect that is reasonable under the circumstances to protect the officer and others from harm.

58.     When Defendant Ebke attacked Keith, Keith was cornered while Defendant Ebke and Officer John Rhodes had the ability to step away and barricade to bring about a peaceful resolution.

59.     Keith had already been tased and did not provide any reason for Defendant Ebke to shoot him.

60.     Keith's shooting therefore was an extreme departure from the standard of care required of police officers when using force and dealing generally with the public.

61.     As a direct and proximate result of Defendant Ebke's actions, Mrs. Robinson and her decedent suffered the injuries identified in Paragraphs 38-40.

## COUNT IV – ASSAULT

### (Against Defendant Ebke)

62.     Plaintiff incorporates the preceding allegations as though they are expressly stated in this Count.

63.     Defendant Ebke intended to cause a harmful or offensive contact with Keith.

64.     Defendant Ebke intended to cause Keith an imminent apprehension of harmful or offensive contact.

65.     Keith, while cornered by two officers in the dark, was put in imminent apprehension of such contact.

66.     As a direct and proximate result of Defendant Ebke's actions, Mrs. Robinson and her decedent suffered the injuries identified in Paragraphs 38-40.

## COUNT V – BATTERY

### (Against Defendant Ebke)

67.     Plaintiff incorporates the preceding allegations as though they are expressly stated in this Count.

68.     Defendant Ebke's actions amount to an intentional, unpermitted contact of Keith's person.

69.     Defendant Ebke's contact with Keith was harmful and offensive.

70.     Defendant Ebke had no reason or justification to harmfully and offensively touch Keith.

71.     As a direct and proximate result of Defendant Ebke's actions, Mrs. Robinson and her decedent suffered the injuries identified in Paragraphs 38-40.

WHEREFORE Plaintiff Sheena Robinson respectfully requests this Court:

A.      Grant judgment in her favor and jointly and severally against Defendants Dylan Ebke and the Town of Dewey Beach;

B.      Award her special damages as she can prove;

C.      Award her compensatory damages as she can prove;

D.      Award her damages, including for mental anguish, under 10 Delaware Code Section 3724 as she can prove;

E.      Award her punitive damages;

F.      Award her costs and attorneys' fees for prosecuting this action;

G.      Award her pre- and post-judgment interest; and

H.      Grant such other relief as the Court deems proper.

**JACOBS & CRUMPLAR, P.A.**

_/s/ Patrick C. Gallagher_
Patrick C. Gallagher, Esq. (DE Bar 5170)
750 Shipyard Drive, Suite 200
Wilmington, DE  19801
(t) (302) 656-5445
(f) (302) 656-5875

DATE:  March 20, 2023                        *Attorneys for Plaintiff*